[Cite as *State v. Young*, 2018-Ohio-701.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO. CA2016-10-201 |
| | : | O P I N I O N |
| - vs - | | 2/26/2018 |
| | : | |
| BRADLEY DEAN YOUNG, | : | |
| Defendant-Appellant. | : | |

CRIMINAL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CR2015-12-1818

Michael T. Gmoser, Butler County Prosecuting Attorney, Michael Greer, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for plaintiff-appellee

Repper, Pagan, Cook, Ltd., Christopher J. Pagan, 1501 First Avenue, Middletown, Ohio 45044, for defendant-appellant

**RINGLAND, J.**

{¶ 1} Defendant-appellant, Bradley Young, appeals his murder conviction in the Butler County Court of Common Pleas. For the reasons detailed below, we affirm.

{¶ 2} On December 2, 2015, at approximately 6:00 a.m., Rebekah K. called 911 for emergency assistance with regard to her two-year-old daughter, K.K., who was not breathing. Deputy Greg Turner and several other law enforcement officials arrived at Young's residence

where Young was attempting to give CPR to K.K. Deputy Turner took over for Young and began administering CPR to K.K. until the EMT squad arrived.

{¶ 3} While life-saving efforts were ongoing, authorities made contact with Young and Rebekah. In describing the events leading to the 911 call, neither Young nor Rebekah reported that K.K. had been beaten or abused. Young, however, mentioned that he and K.K. had been in a recent car accident. Young also claimed that K.K. had recently fallen from a chair in the kitchen and that K.K. had a bump and cut on the back of her head from the faucet.

{¶ 4} There were, however, conflicting stories about who was with K.K. immediately prior to the 911 call. Subsequent investigations revealed that Young and Rebekah had been communicating through text messages. Shortly after 7:00 a.m., Young and Rebekah sent the following messages to each other:

> Young: There [sic] going to try and make us look like bad parents babe not sure how they got three different stories either Chuck[1] never said anything this is stupid.
>
> Young: I love you and stay strong will be with.her [sic] soon
>
> Rebekah: I know babe I love you to [sic]
>
> Young: Just telling them she was laying with both of us in the living in the couch [sic] so they don't try and turn it around on you or me.

{¶ 5} K.K. was transported to Atrium hospital, arriving in a state of cardio pulmonary arrest. While at Atrium, emergency personnel were able to restart K.K.'s heart and staff performed a CT scan on K.K.'s brain. Because of the seriousness of her injuries, K.K. was transported to Cincinnati Children's Hospital.

{¶ 6} Following transportation to Cincinnati Children's, medical staff performed a

---

1. The record reflects that Chuck was Young's roommate who was present that day.

second CT scan on K.K.'s brain. However, efforts to revive K.K. were unsuccessful and she was pronounced dead on December 4, 2016.

{¶ 7} Detectives interviewed Young and Rebekah while K.K. was still in the hospital. Young maintained that he had never harmed K.K. and insisted that both he and Rebekah were with the child on the couch when she suddenly cried out and began having problems breathing. Young continued, however, to tell law enforcement about various "accidents" that had happened to K.K. Young maintained that K.K. had previously fallen off a chair, had been involved in the previously mentioned car accident, and K.K. had recently struck her head on a faucet.

{¶ 8} On December 10, 2016, Young was indicted for involuntary manslaughter, endangering children, permitting child abuse, and murder.

## Voir Dire

{¶ 9} On September 26, 2016, Young's case proceeded to a multiple-day jury trial. During voir dire, Juror 883 disclosed that, 41 years ago, he had been convicted of a felony drug offense in Indiana. Juror 883 indicated that he had been incarcerated for that offense for five months in the "youth center." Juror 883 continued to explain that he was released and subsequently earned an engineering degree.

{¶ 10} Young moved to strike Juror 883 for cause under R.C. 2313.17 and R.C. 2945.25 on the basis of the former felony conviction. The state disagreed and argued that Juror 883 was eligible to serve. Following the exchange, the trial court denied Young's request to strike Juror 883 for cause. Thereafter, Young used two preemptory challenges on two other jurors, but waived any use of his remaining preemptory challenges. Therefore, Juror 883 was empaneled on the jury.

## Trial

{¶ 11} The state introduced the testimonies of various medical experts and law

enforcement personnel. Deputy Turner testified about his communications with Young and Rebekah after EMTs arrived. Deputy Turner testified that he spoke with Rebekah and Young because he was concerned about bruising he observed on K.K.

{¶ 12} Deputy Turner described Rebekah as emotional and distressed. Rebekah told Deputy Turner that K.K. had experienced a nightmare and eventually stopped breathing. Young reported the same general information to Deputy Turner.

{¶ 13} The state called Bradley Peters, a fire lieutenant and EMT for Madison Township. EMT Peters spoke with Young and Rebekah to find out what had happened to K.K. EMT Peters stated:

> [Young] stated that he was asleep alone with the child. [K.K.] was face down on his chest. At some point the child had woken up screaming, crying hysterically. [Young] stated that he thought she possibly had had a nightmare. He got up to go into a different part of the household to get the child's mother. At that point, * * * [K.K.] started breathing ineffectively and they contacted 911 to have us dispatched.

{¶ 14} The state also called Sergeant Jamy Chaney with the Trenton Police Department. Sergeant Chaney spoke with Rebekah, who she described as "nervous, upset, concerned." Rebekah stated that K.K. had been screaming and crying, keeping her and Young awake all night. Rebekah indicated that they were holding K.K. when she went limp and stopped breathing.

{¶ 15} Sergeant Chaney then asked Young if he knew what had happened and Young replied that K.K. had fallen from a chair in the kitchen and hit the back of her head causing a bump and a cut. Young also stated that he and K.K. had been "in a minor, like, fender bender car accident several days before."

{¶ 16} Deputy Brian Romans from the Butler County Sheriff's Office described Rebekah as upset, "emotionally shaken," and stuttering her words. Rebekah told Deputy Romans that K.K. had two "night terrors" that night, the first occurring approximately two

hours before the last one.  During the second night terror, Rebekah stated that K.K. was screaming loudly and "gasping for air."  Young was holding K.K. when she stopped breathing and Young then told Rebekah to call 911.

{¶ 17}  Deputy Romans then spoke to Young.  Deputy Romans testified:

> [Young] went on to explain to me that they were located on the couch.  He was lying on the couch with K.K. on his chest.  Rebekah was in the bedroom.  He stated that during that time, * * * [K.K.], had experienced a night terror that Rebekah had claimed that they were having and he woke her up, he stood up, she started crying, gasping for air, and at one point she went limp.

> He stated that he walked to the bedroom to get Rebekah.  He summons her to call 911 and that is when they begin CPR.

{¶ 18}  Detective Joe Ventre of the Butler County Sheriff's Office testified and authenticated several photographs of Young's hands, which were visibly cut and bruised.

{¶ 19}  On the fourth day of trial, the state called Rebekah to the stand.  Rebekah testified on direct examination, and Young's counsel conducted a lengthy cross-examination.  Near the end of the day, Young's counsel indicated that it still had several hours of additional cross-examination to perform and the matter was adjourned until the following day.

{¶ 20}  The next day, Young's counsel asked the trial court to hold a competency hearing for Rebekah.  Rebekah was questioned by the state, Young's counsel, and the trial court.  Following questioning, Young's counsel moved to strike Rebekah's testimony due to incompetency.  Alternatively, Young's counsel moved for a mistrial.

{¶ 21}  The trial court determined that Rebekah was "incapable of relating just impressions of the facts truthfully" and found her incompetent to testify.  The trial court then struck Rebekah's testimony and Young withdrew the request for a mistrial.  The trial court then instructed the jury:

> Ladies and gentlemen, I'm instructing you and I'm ordering you to disregard the testimony of [Rebekah].  Now, I appreciate that

that's a difficult concept to disregard something that you've actually heard. The Court cannot instruct you to delete something from your mind of what you've actually heard. What I'm ordering you to do is, if somehow you should remember anything that [Rebekah] testified to, you're instructed to disregard it.

For example, say to yourself, I cannot consider or be influenced by that in any way or for any purpose. Obviously that testimony must not be mentioned or otherwise be made part of your deliberations. Understood? Everybody is shaking their head in a vertical fashion.

{¶ 22} Following the conclusion of the state's case-in-chief, Young requested that the trial court dismiss the indictment because the state allegedly called Rebekah to the stand "knowing her mental state and understanding fully that she would take the stand and give false testimony." The trial court denied Young's request for a dismissal of the indictment.

{¶ 23} Prior to the conclusion of its case-in-chief, the state also presented the testimony of numerous medical experts. A neuroradiologist at Cincinnati Children's Hospital testified about CT images of K.K.'s brain. The neuroradiologist testified that the images showed that K.K.'s had suffered deep bleeding on her brain and brain stem and that she had suffered epidural and subdural hemorrhages.

{¶ 24} According to the neuroradiologist, the injuries that K.K. suffered could not be caused by a normal fall. Rather, the injuries that K.K. suffered were consistent with injuries that may be found on "a child hit by a car" or was involved in a "significant motor vehicle collision." Furthermore, based on the severity of the bleeding, and its progression, K.K.'s condition could not have been a delayed response. In other words, the results of K.K.'s CT scan indicated that K.K. suffered a very significant inflicted injury that would have occurred close to the time that she arrived at the hospital.

{¶ 25} The state then presented the testimony of a pediatric ophthalmologist at Cincinnati Children's Hospital. The doctor examined K.K.'s eyes while she was being treated

and discovered that K.K. had a large preretinal hemorrhage that obscured K.K.'s central vision. The doctor also found hemorrhages in the periphery of K.K.'s retina and in all layers of the retina.

{¶ 26} The state then presented the testimony of a pediatrician and clinical fellow in child abuse pediatrics at the Mayerson Center at the Cincinnati Children's Hospital. The pediatrician had examined K.K.'s medical and radiologic records and had also examined K.K. prior to her death. The pediatrician testified that K.K. had suffered from non-accidental injuries caused by abusive head trauma. The two CT scans taken approximately two and one-half hours apart, revealed "significant brain swelling or cerebral edema." The pediatrician opined that K.K. suffered her injuries in close proximity to the time she arrived at the hospital.

{¶ 27} The chief deputy coroner at the Hamilton County Coroner's Office presented the results of the autopsy and declared the manner of death a homicide. The coroner testified that K.K. had bruises on the right and left sides of her face, as well as additional bruising on the right side of her neck. The coroner also explained that she did an internal examination of K.K.'s body and discovered internal bruising on K.K.'s scalp and head.

{¶ 28} The coroner testified that she examined K.K.'s brain and noted that K.K. suffered a subdural hemorrhage on the right side of her brain and a subarachnoid hemorrhage that covered the entire surface of her brain. The coroner explained that K.K.'s brain swelled and caused herniation, which kills brain tissue and creates bleeding. As to the cause of K.K.'s brain injuries, the coroner testified:

> There was an initial injury, trauma to the head. I don't know specifically what it is, if it was multiple blows to the head or if it was shaking, but what happened is it caused swelling in the brain. It caused that hemorrhage on the right hemisphere of the brain as well as – which is called the subdural hemorrhage – it caused * * * the subarachnoid hemorrhage over the entire surface of the brain.

- 7 -

The important thing is here that the brain swelled, because it was injured from the initial injury. Whether it was blows to the head or rotational injury which can occur if the child is shaken, twisted, turned – a child's brain can't handle that.

And like any injury – like if you fracture your forearm, you're going to get swelling and pain. And the brain, if the brain is injured from this blow or this rotational force, this twisting, the brain swelled. That is the lethal injury in her head. It swelled enough that it caused her to stop breathing and her heart to stop beating and she went to the hospital.

{¶ 29} The coroner went on to explain that K.K.'s injury "occurred around the time she went unresponsive and when her heart stopped beating." The coroner believed that the injury was inflicted within minutes of the time her heart stopped beating. The coroner stated:

The injury we're seeing here is something that was acute. She was injured. She went unresponsive and her heart stopped beating. It's not something that happened three or four days ago and took three or four days for her brain to get injured and to swell. This is something that she was injured, her brain swelled, she died. This is – this is within minutes. This is not from three or four days ago.

The coroner testified that, to a reasonable degree of medical certainty, the cause of K.K.'s death was "complications of non accidental [sic] trauma to the head."

**Verdict**

{¶ 30} Following the close of evidence, the matter was submitted to the jury for deliberation. Young was found guilty on all counts and the trial court imposed a 15-year-to-life prison term for his murder conviction in violation of R.C. 2903.02(B). Young now appeals his conviction, raising four assignments of error for review.

{¶ 31} Assignment of Error No. 1:

{¶ 32} THE TRIAL COURT ERRED BY OVERRULING YOUNG'S CHALLENGE TO JUROR 883 FOR CAUSE.

{¶ 33} In his first assignment of error, Young argues that the trial court erred by

- 8 -

overruling his challenge to dismiss Juror 883 for cause. We find Young's argument to be without merit.

{¶ 34} Young argues that Juror 883 was a convicted felon who had not been pardoned, and thus was incompetent to serve as a juror. As a matter of state law, the Ohio Supreme Court has "'recognized that where the defense exhausts its peremptory challenges before the full jury is seated, the erroneous denial of a challenge for cause in a criminal case may be prejudicial.'" *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 87, quoting *State v. Cornwell*, 86 Ohio St.3d 560, 564 (1999). "However, '[a] defendant in a criminal case cannot complain of prejudicial error in the overruling of a challenge for cause if such ruling does not force him to exhaust his peremptory challenges.'" *Id.*, quoting *State v. Eaton*, 19 Ohio St.2d 145 (1969), paragraph one of the syllabus. As a result, the Ohio Supreme Court has held that "'[i]f the trial court erroneously overrules a challenge for cause, the error is prejudicial only if the accused eliminates the challenged venireman with a peremptory challenge and exhausts his peremptory challenges before the full jury is seated.'" *Id.*, quoting *State v. Tyler*, 50 Ohio St.3d 24, 30-31 (1990).

{¶ 35} We find Young's argument to be without merit because he failed to exhaust his peremptory challenges. Even if the trial court had erred by overruling the for-cause challenge, any such error was not prejudicial. In the present case, Young utilized two of his four peremptory challenges, but left the remaining two unused. Young could have excluded Juror 883 through his own volition. Because he did not, Young "acquiesced in the jury" that was ultimately selected. *Id.* at 88. Young's first assignment of error is without merit and hereby overruled.

{¶ 36} Assignment of Error No. 2:

{¶ 37} REBEKAH'S TESTIMONY WAS INADMISSIBLE UNDER EVID.R. 601(A), R.C. 2317.01, AND DUE PROCESS BECAUSE SHE WAS INCAPABLE OF RELATING

TRUTHFUL FACTS.

**{¶ 38}** In his second assignment of error, Young argues that Rebekah's testimony was inadmissible because she was incapable of relating truthful facts. We find Young's argument is without merit.

**{¶ 39}** Evid.R. 601(A) states that every person is competent to be a witness except "[t]hose of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Evid.R. 601(A); *State v. Nasser*, 10th Dist. Franklin No. 02AP-1112, 2003-Ohio-5947, ¶ 38. As noted by the Ohio Supreme Court:

> A plain reading of Evid.R. 601(A) leads to the conclusion that the competency of individuals ten years or older is presumed, while the competency of those under ten must be established. * * * The rule favors competency, conferring it even on those who do not benefit from the presumption, such as children under ten, if they are shown to be capable of receiving just impressions of the facts and transactions respecting which they are examined and capable of relating them truly. * * * As a result, absent some articulable concern otherwise, an individual who is at least ten years of age is per se competent to testify.

*State v. Clark*, 71 Ohio St.3d 466, 469 (1994) (citations omitted).

**{¶ 40}** In the present case, Rebekah told two conflicting stories. To first responders, Rebekah did not disclose any abuse and told a story that mostly corroborated Young's account of the incident, i.e., that K.K. had suddenly fallen into the unresponsive state without any physical abuse. However, Rebekah told a different story while on the stand. In her testimony, Rebekah disclosed that Young had been abusing K.K. by spanking her, smacking her, holding her mouth shut, shaking her, and punching her. On the night K.K. became unresponsive, Rebekah testified that Young had shaken and punched K.K. multiple times because she was crying.

**{¶ 41}** Young complains that Rebekah's testimony was inadmissible because she

was incapable of relating truthful facts. The trial court agreed that Rebekah was unable to relate truthful facts and her testimony was stricken from the record. The trial court struck Rebekah's testimony following concerns that Rebekah may have been under the influence of drugs at the time of trial. Furthermore, there were concerns that Rebekah was relaying untruthful testimony in the hopes of "getting it over with." On cross-examination, Rebekah gave several inconsistent answers. When asked to explain her inconsistent answers, Rebekah admitted that some of her answers were not true, that she was anxious and stressed, and that sometimes she "just want[s] to hurry up and get it done, so I just hurry up and answer the questions." The trial court also had the following exchange with Rebekah:

> THE COURT: [Rebekah], when the jury is sitting there looking at you and I'm looking at you and all the lawyers are looking at you and all those people in the back row are looking at you, you told me you just answer the question just to get through it?
>
> [REBEKAH]: Yes.
>
> THE COURT: And when you answer a question truthfully, do you know that it's not the truth?
>
> [REBEKAH]: No.
>
> THE COURT: You just throw out an answer and you don't know whether it's truthful or untruthful, you just respond?
>
> [REBEKAH]: Yes.
>
> THE COURT: How do you pick how to respond, yes or no, for example? How do you pick?
>
> [REBEKAH]: I – I don't – I just try to answer what they want me to answer.
>
> THE COURT: So, when [the prosecutor] is asking you questions and [the assistant prosecutor] [is] asking you questions, you'll say what you think they want to hear?
>
> [REBEKAH]: No.
>
> THE COURT: When [Defense Counsel 1] [is] asking you questions or [Defense Counsel 2] is asking you questions, then you just say what you think what [sic] they want to hear.
>
> [REBEKAH]: Yes.

THE COURT: Why is that?

[REBEKAH]: Because I'm nervous and I don't like being yelled at and everybody in here just makes me really nervous.

THE COURT: So you told me that you don't care to give the answers – you're not trying to give answers that you think the prosecution wants to hear but you want to give answers that you think the defense wants to hear?

[REBEKAH]: Yes.

* * *

[REBEKAH]: I've told the prosecutors the truth about my story so I know that they already know.

THE COURT: So, since they already know the truth you don't care if you tell the truth to them today?

[REBEKAH]: Yeah, I do.

THE COURT: Well, that's not what you told me a minute ago. A minute ago you said, you're not trying to please them and maybe that's not true.

So, we got on this question of whether or not you're trying to please the Prosecutors and you're saying I'm not trying to please the Prosecutors but you're trying – then you said you're trying to please the Defense attorneys?

[REBEKAH]: Yes.

THE COURT: Can I ask? Why are you trying to please the Defense attorneys?

[REBEKAH]: Because the Prosecutors already know what happened, I told them everything, so I don't feel like I have to please them and [Defense Counsel], he doesn't know the whole story, he doesn't know my side and I just feel like when he's coming at me I just have to agree with him.

{¶ 42} As previously noted, the trial court found Rebekah incapable of relating just impressions of the facts truthfully and struck her prior testimony. Following its decision, the trial court instructed the jury:

Ladies and gentlemen, I'm instructing you and I'm ordering you to disregard the testimony of [Rebekah]. Now, I appreciate that that's a difficult concept to disregard something that you've actually heard. The Court cannot instruct you to delete something from your mind of what you've actually heard. What I'm ordering you to do is, if somehow you should remember

- 12 -

anything that [Rebekah] testified to, you're instructed to disregard it.

For example, say to yourself, I cannot consider or be influenced by that in any way or for any purpose. Obviously that testimony must not be mentioned or otherwise be made part of your deliberations. Understood? Everybody is shaking their head in a vertical fashion.

{¶ 43} We find no error in the trial court's handling of Rebekah's testimony. Initially, Young complains that he was deprived of due process because the state put Rebekah on the stand as a witness. Young complains that the state "knew about Rebekah's potential for lying when she told responders, officers, detectives, and the trial judge that she had no idea who abused [K.K.]." As a result, when Rebekah testified at trial that Young had been K.K.'s abuser "the prosecutor assumed the risk of what eventually materialized – Rebekah was deemed incompetent and infected the jury with inadmissible and incompetent testimony. The prosecutor's failure to safeguard against this manifest risk violated due process."

{¶ 44} However, contrary to Young's arguments, there was no violation of due process. It is well-established that the touchstone of due process analysis is the fairness of the trial, and not any perceived culpability of a prosecutor. *Smith v. Phillips*, 455 U.S. 209, 219, 102 S. Ct. 940 (1982). While Rebekah's testimony was stricken based on her strange and conflicting answers, "[t]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial." *United States v. Hasting*, 461 U.S. 499, 508-509, 103 S. Ct. 1974 (1983); *State v. Wilson*, 74 Ohio St.3d 381, 398-399 (1996).

{¶ 45} There is no dispute that Rebekah was a poor witness. The record reflects that on cross-examination Rebekah was timid and evasive in her responses. Though Rebekah never recanted her testimony that Young had abused K.K., she testified that she had agreed to certain statements made by defense counsel "to hurry up and get it done." Rebekah informed the trial court that she did so because the state already knew "the truth" and that

the defense counsel didn't have the "whole story," so she felt compelled to agree with defense counsel.

{¶ 46} While Rebekah was a poor witness and the trial court struck her testimony based on her unreliability, Young has failed to show that he was deprived of due process. Furthermore, though Young claims otherwise, there is no evidence to suggest that the state knew or should have known that Rebekah was incompetent or would provide incompetent testimony. As a result, we find Young was not deprived of due process, even though Rebekah's testimony was deemed incompetent and struck from the record.

{¶ 47} Furthermore, the trial court sufficiently remedied any prejudice suffered from Rebekah's testimony. As this court has previously stated "[c]urative instructions 'are presumed to be an effective way to remedy errors that occur during trial.'" *State v. Tyree*, 12th Dist. Fayette No. CA2016-09-012, 2017-Ohio-4228, ¶ 16, quoting *State v. Trzeciak*, 12th Dist. Brown No. CA2014-06-010, 2015-Ohio-2219, ¶ 24. "A jury is presumed to follow instructions given by the trial court." *State v. Carpenter*, 12th Dist. Butler No. CA2005-11-494, 2007-Ohio-5790, ¶ 20.

{¶ 48} The trial court's curative instruction in this instance was appropriate and plainly instructed the jury not to consider Rebekah's testimony or be influenced by it in any way or for any purpose. Young asserts, however, that Rebekah's testimony was so prejudicial, that the trial court's minimal instruction could not "un-ring" the effect on the jury. Young's position, however, assumes that the limiting instruction was ineffective and that the risk of prejudice was too high for the instruction to negate it. However, we decline to make this assumption. *See State v. Shouse*, 12th Dist. Brown No. CA2013-11-014, 2014-Ohio-4620, ¶ 14. As discussed in more detail below, there was enough circumstantial evidence to prove that Young was K.K.'s abuser. As a result, we overrule Young's second assignment of error.

{¶ 49} Assignment of Error No. 3:

{¶ 50} THE TRIAL COURT ERRED IN FAILING TO STRIKE REBEKAH'S STATEMENTS TO RESPONDERS AND OFFICERS AT THE SCENE.

{¶ 51} In his third assignment of error, Young argues the trial court erred by admitting and not striking Rebekah's statements made to responders and officers at the scene following the 911 phone call. We find Young's argument to be without merit.

{¶ 52} Young did not object to the statements at trial and he has therefore waived all but plain error on appeal. Pursuant to Crim.R. 52(B), plain error exists where there is an obvious deviation from a legal rule that affected the defendant's substantial rights or influenced the outcome of the proceedings. *State v. Blanda*, 12th Dist. No. CA2010-03-050, 2011-Ohio-411, ¶ 20. As this court has stated previously, "[n]otice of plain error must be taken with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice." *State v. Nixon*, 12th Dist. Warren No. CA2011-11-116, 2012-Ohio-1292, ¶ 10. An error does not rise to the level of plain error unless, but for the error, the outcome of the trial would have been different. *State v. Krull*, 154 Ohio App.3d 219, 2003-Ohio-4611, ¶ 38 (12th Dist.)

{¶ 53} "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay testimony is inadmissible unless the testimony falls within one of the recognized exceptions to the hearsay rule. *See* Evid.R. 802.

{¶ 54} Young does not dispute the admissibility of Rebekah's statements under the applicable hearsay rules, but instead argues that her statements should have been stricken regardless. Young claims that the trial court should have stricken Rebekah's statements made to first responders when Rebekah was deemed incompetent to testify at trial. As previously noted, Rebekah initially denied that Young had abused K.K., but there were conflicting stories as to whether Young was alone with K.K. immediately before she became

- 15 -

unresponsive. According to Young, "Rebekah's statements to responders and officers impacted the verdict because they established [Young's] presence with [K.K.] when [K.K.'s] fatal symptoms arose." Those statements then "helped the jury to infer" that Young alone recklessly abused K.K. and proximately caused her death.

{¶ 55} However, following a thorough review of the record, we find no error, let alone plain error, to sustain Young's argument. Though Rebekah was deemed incompetent at trial, there is no evidence that Rebekah was incompetent when she made the statements to first responders. Furthermore, there was additional evidence that Young committed the abusive acts. Detective Romans and EMT Peters both testified that Young told them that he was with the child alone while Rebekah was in the back bedroom, i.e., Young was alone with the child immediately before the abusive trauma occurred. In addition, there is evidence that Young sent a text message to Rebekah to get their stories straight that K.K. "was laying with both of us in the living in the couch [sic] so they don't try and turn it around on you or me." That evidence, coupled with the photographs of Young's cut and bruised knuckles, is circumstantial evidence that Young abused K.K. and inflicted the fatal blows. As a result, we overrule Young's third assignment of error.

{¶ 56} Assignment of Error No. 4:

{¶ 57} THE DEFENDANT'S FELONY MURDER AND PREDICATE CHILD-ENDANGERING CONVICTIONS WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THERE WAS INSUFFICIENT EVIDENCE TO PROVE THAT HE RECKLESSLY ABUSED [K.K.] AND PROXIMATELY CAUSED HER DEATH.

{¶ 58} In his fourth assignment of error, Young argues the verdict is against the manifest weight of the evidence and there was insufficient evidence to sustain a conviction. We disagree.

{¶ 59} The concepts of sufficiency of the evidence and weight of the evidence are

legally distinct. *State v. Wright*, 12th Dist. Butler No. CA2012-08-152, 2014-Ohio-985, ¶ 10. Nonetheless, as this court has observed, a finding that a conviction is supported by the manifest weight of the evidence is also dispositive of the issue of sufficiency. *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19. "Because sufficiency is required to take a case to the jury, a finding that a conviction is supported by the weight of the evidence must necessarily include a finding of sufficiency." *State v. Hart*, 12th Dist. Brown No. CA2011-03-008, 2012-Ohio-1896, ¶ 43.

{¶ 60} A manifest weight challenge scrutinizes the proclivity of the greater amount of credible evidence, offered at a trial, to support one side of the issue over another. *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. In assessing whether a conviction is against the manifest weight of the evidence, a reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Morgan*, 12th Dist. Butler Nos. CA2013-08-146 and CA2013-08-147, 2014-Ohio-2472, ¶ 34.

{¶ 61} It is well-established that both circumstantial and direct evidence have the same probative value. *State v. Saunders*, 12th Dist. Fayette No. CA2012-03-006, 2013 Ohio 2052, ¶ 44. In fact, in some instances, certain facts can be established only by circumstantial evidence. *State v. Crutchfield*, 12th Dist. Warren No. CA2005-11-121, 2006 Ohio 6549, ¶ 20. Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind. *State v. Ortiz-Bajeca*, 12th Dist. Butler No. CA2010-07-181, 2011 Ohio 3137, ¶ 20. A conviction based on purely circumstantial evidence is no less sound than a conviction based on direct evidence. *State v. Haley*, 12th

Dist. Butler No. CA2012-10-211, 2013-Ohio-4123, ¶ 8.

{¶ 62} Pursuant to R.C. 2903.02(B) "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of [R.C.] 2903.03 or 2903.04." Under R.C. 2919.22(B)(1), child endangering is committed when one abuses a child under 18 years of age.

{¶ 63} Child endangering in violation of R.C. 2919.22(B)(1) is a second-degree felony and is defined as an "offense of violence" under R.C. 2901.01(A)(9), and may therefore serve as a predicate offense for felony murder. *State v. Tompkins*, 12th Dist. Butler No. CA2014-07-159, 2015-Ohio-2316, ¶ 9; *State v. Blanda*, 2011-Ohio-411 at ¶ 17.

{¶ 64} Young concedes that the state proved that some abusive act proximately caused K.K.'s fatal brain swelling and herniations. Young also concedes that the state proved that his roommate, Rebekah, and himself were present when the abusive acts occurred. However, Young maintains that the state failed to prove that he committed the abusive act in the relevant timeframe.

{¶ 65} Following a thorough review of the record, we find Young's argument is without merit. In the present case, and as Young concedes, the state proved that K.K. died from an abusive act that caused horrific internal brain injury. Though Young remained steadfast during police interrogation that he had not harmed K.K. and that Rebekah was with him immediately prior to K.K.'s final scream, there is conflicting evidence in the record to rebut his prior statements.

{¶ 66} The state presented evidence that Young and Rebekah had conflicting stories about who was with K.K. immediately prior to becoming unresponsive. As previously noted, both Detective Romans and EMT Peters testified that Young told them that he was with the child alone while Rebekah was in the back bedroom, i.e., Young was alone with the child

immediately before the abusive trauma occurred. Furthermore, Young's text message to Rebekah that he was "[j]ust telling them she was laying with both of us" so that "they don't try and turn it around on you or me" could be considered evidence of deception. While a two-year-old child was unconscious on the floor, Young had the mindset to text Rebekah to get their stories straight about who was with the child and when. These prior statements, along with the pictures of Young's battered and cracked knuckles could lead a jury to infer that Young was the responsible party.

{¶ 67} The state's evidence was sufficient to support a guilty finding and the jury's decision was not against the manifest weight of the evidence. Acting as trier of fact, the jury was in the best position to resolve factual questions and evaluate witness credibility. *State v. Stanforth*, 12th Dist. Clermont No. CA2016-07-052, 2017-Ohio-4040, ¶ 33. The testimony and evidence introduced at trial supports a finding that Young so abused K.K. as to cause her injuries and ultimate death. As a result, we find Young's fourth and final assignment of error to be meritless, and it is hereby overruled.

{¶ 68} Judgment affirmed.

S. POWELL, P.J., and PIPER, J., concur.