[Cite as *State v. Reed*, 2023-Ohio-878.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Appellee, | : | CASE NO. CA2022-03-012 |
| - vs - | : | O P I N I O N<br>3/20/2023 |
| | : | |
| HEATHER NICOLE REED, | : | |
| Appellant. | : | |

CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 21CR38053

David P. Fornshell, Warren County Prosecuting Attorney, and Kirsten A. Brandt, Assistant Prosecuting Attorney, for appellee.

Johnna M. Shia, for appellant.

**HENDRICKSON, P.J.**

{¶1} Heather Reed appeals from her convictions for endangering children and felonious assault. After reviewing and considering the issues and the applicable case law, we affirm her convictions.

**I. Factual and Procedural History**

{¶2} Reed ran a child daycare business in her home. In June 2020, Reed began

caring for Nicole and Anthony Armbruster's three children, 17-month-old twin boys, "Brian" and "Tony," and their three-year-old sister, "Kate."[1]  One day in September, Nicole picked up the children and noticed that Kate and Tony had marks on their faces that they did not have when she dropped them off that morning.  Reed explained that Kate had run into a wall and that Brian had hit Tony with a toy.  Nicole did not entirely believe Reed.  To Nicole, the marks looked more like the children had been being slapped.  Around the same time, Kate began to resist going to Reed's house.  Kate would scream when they pulled into Reed's driveway and beg not to go.

{¶3}    A month or so later, on November 4, 2020, Nicole dropped off the children at Reed's around 6:15 a.m.  At approximately 12:30 p.m., Reed sent Nicole a text message with pictures of the children eating pizza for lunch.  The pictures showed Brian in a walker and Tony in a highchair.  Nicole sent a message back asking Reed if she could have a video call with the children, and Reed agreed.  Once the video call was established, Nicole watched as Brian looked at the camera and "talked" while he ate.  About a half-hour later, while returning to work from her own lunch, Nicole noticed that she had several calls from Reed, so she initiated a video call with her.  When Reed answered, she screamed, "you need to get here."  Reed turned her phone to show Brian lying motionless on the floor with his eyes closed.  Nicole watched as Reed tried unsuccessfully to rouse him.

{¶4}    Reed called 911 around 1 p.m. and emergency personnel were dispatched to her home.  Lebanon police officer Patrick Jenkinson was the first on the scene.  He saw Brian lying unresponsive on the floor, taking quick, shallow breaths.  Jenkinson asked Reed if Brian had fallen and Reed replied that she assumed that he had, but she was not sure because she had not been in the room.  Paramedic Jonathan Kitchen soon arrived and

---

1. We use these pseudonyms to protect the privacy of these minor children.

- 2 -

began assessing Brian's condition. Kitchen heard Reed say that Brian had been standing and fell backwards and that she had heard a boom. To Kitchen, Brian's condition appeared far more serious than would result from a fall from a standing position.

{¶5} The paramedics took Brian to Atrium Medical Center where an emergency-room physician evaluated him. The doctor could not immediately figure out what was causing Brian's symptoms. Because his symptoms were consistent with a serious head injury, the doctor had Brian airlifted to Dayton Children's Hospital.

{¶6} At Dayton Children's, a team of pediatric physicians from neurology, neurosurgery, and ophthalmology was assembled to evaluate Brian. Testing and examination revealed subdural hemorrhages[2] at multiple locations around his brain, injury to the brain tissue, and hemorrhages through all three layers of the retina in both eyes. Brian's injuries were not consistent with Reed's claim that he fell, and a concern arose that abuse may have been a factor.

{¶7} Dr. Kelly Liker, the Chief of the Division of Child Advocacy at the hospital and a specialist in child abuse, took the lead. She considered all the information available—medical histories, reports of those involved, and the results of tests and imaging done at the hospital. Dr. Liker concluded that Brian's injuries were not consistent with a short-distance fall and single impact—whether from falling from standing or falling off a couch or even tipping over in a highchair. Moreover, the injuries were such that the onset of symptoms would have been almost immediate, meaning that the injuries likely occurred shortly after Nicole had her video call with the children at 12:30 p.m., when Brian was behaving normally. Dr. Liker concluded that Brian's injuries were most consistent with abusive head trauma—forceful, rapid, and repeated shaking, with or without impact—what

---

2. A subdural hemorrhage is a type of brain injury that occurs when blood collects between the surface of the brain and the inner layer of the outermost membrane covering the brain.

is colloquially known as shaken-baby syndrome.

{¶8} Reed was indicted for endangering children under R.C. 2919.22(B)(1) as a second-degree felony, for causing Brian serious physical harm, and for second-degree felonious assault under R.C. 2903.11(A)(1). She was also charged with misdemeanor endangering children related to the marks that Nicole observed on Tony and Kate back in September. Reed exercised her right to a jury trial.

{¶9} At trial, the state presented testimony from numerous people. Dr. Liker testified as an expert in child-abuse pediatrics and discussed her conclusion that Brian had suffered abusive head trauma. The testimony from other witnesses showed that Reed gave inconsistent accounts of how Brain was injured. James Steltenkamp, the father of one of Reed's children, testified that Reed had told him that Brian fell backwards and hit his head but that she did not witness it. Steltenkamp also said that Reed had told him that she put Brian down for a nap after he fell and later called 911 when she noticed that he was lethargic and unresponsive. Keri Shearer, a friend of Reed, testified that Reed had told her that Brian was injured when the highchair he was sitting in tipped over backwards and that afterwards he was lying on the floor unresponsive. Brian's mother, Nicole, testified that Reed had told her that Brian rolled off the couch. Lastly, Detective Timothy Cooper testified that Reed had told him that, while she was in the kitchen helping another child, she heard a loud cry come from the living room and found Brian lying on the living room floor.

{¶10} Reed testified in her own defense. According to her, Brian had been lethargic all morning. After lunch, said Reed, she cleaned up the boys and put Tony in the pack-n-play and Brian on his feet in the living room and then went to the kitchen to help Kate. Two to three minutes later, Reed heard a noise and then some faint whimpering, grunting, or wailing sounds coming from the living room. She peaked around the corner from the kitchen and saw Brian lying on the floor with his head on the floor in front of the entry door. Reed

went quickly to Brian. He stopped making the grunting and wailing noises, his eyes rolled up to the top of his head, and he became unresponsive. Brian's eyes were open, but he was not responding to her. Reed said that she became extremely emotional and scared. She called 911, and when the operator asked what had happened, Reed said that she thought Brian had fallen backwards and hit his head on the floor.

{¶11} Reed's defense at trial was that she did not abuse Brian. Therefore, whatever caused his injuries must have happened before he got to her house and there was a delay in the manifestation of the symptoms. Reed presented no expert testimony to support her theory or to rebut Dr. Liker's expert opinions.

{¶12} The jury found Reed guilty of the felony charges related to Brian but acquitted her of the misdemeanor charges. The trial court sentenced Reed to an indeterminate sentence of five to seven-and-one-half years in prison.

{¶13} Reed appealed.

## II. Analysis

{¶14} Reed assigns three errors to the trial court. Reviewing them out of order, we begin with the third assignment of error.

### A. The Fairness of the Trial

{¶15} Assignment of Error No. 3:

{¶16} REED WAS DENIED A FAIR TRIAL IN VIOLATION OF HER RIGHTS TO DUE PROCESS UNDER ARTICLE [I] SECTION 16 OF THE OHIO CONSTITUTION, AND THE SIXTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.

{¶17} Reed argues that the trial court abused its discretion when it permitted a biased juror to remain on the jury over defense counsel's request to remove the juror for cause. She also argues that the live streaming of the trial over the internet violated the

mandate of separation of the witnesses.

*Juror Bias*

**{¶18}** "A trial court's ruling on a challenge for cause will not be disturbed on appeal unless the trial court abused its discretion." (Citation omitted.) *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, ¶ 80.

**{¶19}** Reed argues that the trial court abused its discretion when it denied defense counsel's request to have Juror H excused from the jury. She says that the record demonstrates that the juror failed to reveal during voir dire that she knew one of the state's witnesses. In any event, says Reed, because the juror had a relationship with the witness, the juror should have been excused for cause. The juror was ultimately excused and replaced with an alternative. But Reed contends that this happened too late and that the juror could have infected the jury panel.

**{¶20}** As an initial matter, we note that "'[t]here is no constitutional prohibition against jurors simply knowing the parties involved or having knowledge of the case.'" *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, ¶ 208, quoting *McQueen v. Scroggy*, 99 F.3d 1302, 1320 (6th Cir.1996). "A juror is permitted to serve so long as her relationship to a person in the case is distant and casual, rather than close and ongoing." *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, ¶ 128, citing *Hale* at ¶ 208. Here, Juror H told the court that her relationship with the witness was only casual.

**{¶21}** More importantly, "[a] claim of juror misconduct must focus on the jurors who were actually seated and not those excused. Thus, to establish a constitutional violation in this situation, the appellant must demonstrate that one of the jurors seated was not impartial." (Citation omitted.) *State v. Williams*, 79 Ohio St.3d 1, 4 (1997), citing *Ross v. Oklahoma*, 487 U.S. 81, 85-86, 108 S.Ct. 2273 (1988).

**{¶22}** We applied this rule in *State v. Scurry*, 12th Dist. Madison No. CA95-09-031,

1996 WL 421754 (Jul. 29, 1996). During voir dire in that case, the state moved to have one juror dismissed for cause and a second juror asked a question that implied criticism of the voir dire examination. In the end, neither juror was selected for the panel. "'[A]ny claim that the jury was not impartial,'" we said, "'is not focused on the juror excused * * * but rather is focused on the jurors who ultimately sat.'" *Scurry* at *2, quoting *State v. Broom*, 40 Ohio St.3d 277, 288 (1988), citing *Ross.* We continued: "To show a constitutional violation resulting from the juror selection process an appellant must show that one of the jurors who was seated was not impartial. In this case, however, neither of the prospective jurors who made remarks about the selection process was selected to serve at appellant's trial." *Id.*

{¶23} We also rejected the defendant's claim in *Scurry* that the entire jury panel was tainted by the two jurors' comments, saying that "[a] party challenging the entire jury panel has the burden of showing that the jurors were either unlawfully empaneled or that the jurors cannot be fair and impartial." *Id.*, citing 47 American Jurisprudence 2d, Jury, Section 251 (1995). "Mere speculation as to bias among the pool of prospective jurors will not justify quashing the entire venire." *Id.*, citing 47 American Jurisprudence 2d, Jury, Section 252 (1995). We found no evidence that the trial court abused its discretion by not dismissing the entire jury panel, because there was "no evidence in the record to suggest that the jury panel was not impartial or that it was affected in any way by the comments of either juror." *Id.* at *3.

{¶24} The same is true here. Juror H did not participate in the jury's deliberations. And there is no evidence—none, not a scintilla—that Juror H was biased or that the juror in any way affected the jury.

*Live Streaming of the Trial*

{¶25} The trial court live streamed Reed's trial over the internet, as it did most trials. Reed argues that this violated her right to a fair trial by violating the order that witnesses be

separated.

{¶26} "R.C. 2945.03 specifies the right of a trial judge in a criminal trial to control the trial proceedings. Orders relating to witnesses are entrusted to the sound discretion of the trial court." *State v. Richey*, 64 Ohio St.3d 353, 365 (1992), *abrogated on other grounds*, *State v. McGuire*, 80 Ohio St.3d 390 (1997). In *Richey*, the defendant asked that the witnesses be separated, and the court agreed. He also asked that they be sequestered from each other and admonished not to discuss their testimony after they testified. This motion was denied by the trial court. The Court concluded that the defendant "failed to demonstrate any need for the measures he requested." *Id.* The defendant, said the Court, "could question witnesses during cross-examination about any prior discussions." *Id.* The Court further noted that the defendant "also fail[ed] to cite specific instances of preventable discussions, or any prejudice from the lack of such orders, or any authority requiring such orders." *Id.*

{¶27} Here, Reed did not seek a mistrial or ask the trial court to instruct witnesses not to watch the live stream. She only expressed concern about the potential for violation of the separation-of-witnesses order. The state told the court that it had instructed its witnesses not to view the live stream of the trial proceedings and that it had no knowledge that any witness had failed to comply with the instruction. The trial court advised Reed that she could cross-examine witnesses about the matter if she wanted. She did not do so. Reed fails to establish that she was prejudiced by the live stream of the trial.

{¶28} The third assignment of error is overruled.

**B. The Evidence**

{¶29} Assignment of Error No. 1:

{¶30} REED'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶31} Assignment of Error No. 2:

{¶32} REED'S CONVICTIONS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶33} Reed was convicted of endangering children and felonious assault for causing Brian's injuries. She argues that there was insufficient evidence that she was the one who caused the injuries and further that the weight of the evidence is against such a finding.

{¶34} Sufficiency of the evidence concerns whether the evidence presented at trial is legally sufficient to sustain a verdict. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 318-319, 99 S.Ct. 2781 (1979).

{¶35} In contrast to a sufficiency challenge, a manifest-weight challenge "concerns 'the inclination of the *greater amount of credible evidence * * ** to support one side of the issue rather than the other.'" (Emphasis sic.) *Thompkins* at 387, quoting *Black's Law Dictionary* 1594 (6th Ed.1990). "To evaluate a claim that a jury verdict is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, ¶ 162, citing *id.*, citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶36} Although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is

supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶37} Reed was found guilty of felonious assault in violation of R.C. 2903.11(A)(1), which pertinently provides that "[n]o person shall knowingly * * * cause serious physical harm to another * * *." She was also found guilty of endangering children in violation of R.C. 2919.22(B)(1) and (E)(2)(d), which together provide that no person shall abuse a child under 18 years of age where the abuse results in serious physical harm. There is no dispute here that Brian suffered serious physical harm. What Reed contends is that the state failed to prove beyond a reasonable doubt that she is one who inflicted it.

{¶38} The evidence presented at trial can be summarized as follows: Brian appeared to be okay when his mother dropped him off at Reed's house early that November morning and appeared to be okay about a half-hour before he collapsed on the floor. According to his mother, Brian was acting normal before she dropped him off and had no apparent injuries. At 12:30 p.m., he was eating his lunch and appeared normal. Half an hour later, Brian was motionless on the floor, suffering symptoms of serious head trauma.

{¶39} According to Reed, she did not do anything to cause the injuries. Reed said that she did not see what happened. All she knew was that Brian was fine during lunch, then she put him in the living room, and a short time later she heard a noise and saw him lying on the living room floor. Reed said that Brian was uncommonly lethargic all morning, suggesting that he had been injured before he arrived at her house and that the symptoms did not manifest until later that day.

{¶40} Reed's credibility, though, was called into question by the testimony of the state's witnesses. Their testimony showed that Reed gave different accounts of what happened to different people. She even told one witness that the highchair Brian was sitting in tipped over—an account that was flatly contradicted by what she told other witnesses.

Regardless, none of Reed's accounts of the incident explained the seriousness of Brian's injuries.

{¶41} Furthermore, Dr. Liker's expert testimony all but dismissed Reed's theories as implausible. Based on all the information that she had, Dr. Liker's medical opinion was that Brian's injuries were the result of abusive head trauma. Nothing else, she said, could reasonably explain the injuries—not a fall from standing, not being pushed off a couch, not even tipping over in highchair. According to Dr. Liker, the severity of Brian's injuries was like that observed when a child has been involved in a car accident or fallen out of a second-story window. While Dr. Liker could not pinpoint the precise time of the injury, she explained that, given the severity, the onset of symptoms would have been almost immediate.

{¶42} The jury was free to reject Reed's testimony in favor of Dr. Liker's. *See State v. Milby*, 12th Dist. Warren No. CA2013-02-014, 2013-Ohio-4331, ¶ 37 ("The jury was entitled to believe the state's witnesses and disbelieve the defense's theory of the case"); *State v. Woodard*, 12th Dist. Warren No. CA2016-09-084, 2017-Ohio-6941, ¶ 24 ("The jury, as the trier of fact, was free to believe all, part, or none of the testimony of each witness who appear[ed] before it"). We must defer to the jury's determinations of the witnesses' credibility. *See Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, ¶ 6 (saying that in a manifest-weight review "[i]t is well-settled that the responsibility of weighing the credibility of a witness rests with the fact-finder").

{¶43} Moreover, the jury could base its decision on circumstantial evidence. *See State v. Coleman*, 12th Dist. Butler No. CA2010-12-329, 2011-Ohio-4564, ¶ 26. "Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Young*, 12th Dist. Butler No. CA2016-10-201, 2018-Ohio-701, ¶ 61. This evidence has the same probative value as

direct evidence. *Id.*; *Jenks*, 61 Ohio St.3d at 272. Indeed, "[i]n some instances certain facts can only be established by circumstantial evidence." *Jenks* at 272.

**{¶44}** In addressing challenges to circumstantial evidence in these types of cases, we have said that "[t]he fact that the infant was healthy until being left alone in appellant's care is circumstantial evidence that appellant abused the infant and caused the infant serious physical harm while the infant was in [her] custody." *State v. Evans*, 12th Dist. Warren No. CA2017-04-049, 2018-Ohio-916, ¶ 65, citing *Milby*; *see also State v. Ligon*, 12th Dist. Clermont No. CA2009-09-056, 2010-Ohio-2054. *Accord State v. Woodson*, 8th Dist. Cuyahoga No. 85727, 2005-Ohio-5691. We quoted *Woodson* by stating, "'[i]t is not unusual that evidence of shaken baby syndrome [or abusive head trauma] may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained.'" *Milby* at ¶ 39, quoting *Woodson* at ¶ 53.

**{¶45}** Recognizing the importance of Dr. Liker's testimony to the state's case, Reed focuses her arguments on challenging her testimony. Reed argues that Dr. Liker could say only that Brian's injuries were "most consistent" with a general diagnosis of abusive head trauma and abuse, but that the doctor's testimony also shows there were other conditions that could have produced similar symptoms that were just as likely to have occurred. She cites Dr. Liker's testimony that the symptoms of a seizure are like those that Brian exhibited. Reed also points out that Dr. Liker testified that abusive head trauma could be caused by other mechanisms that produce similar symptoms and delayed manifestation.

**{¶46}** There is no conflict in the evidence on this question. Reed is merely emphasizing some of Dr. Liker's testimony in an effort to raise doubts as to the causal mechanism for Brian's injuries. There is no real conflict in her testimony. Dr. Liker did not suggest the precise mechanism that caused Brian's injuries (i.e., whether shaking, hitting, or throwing him), but she testified extensively about the nature of his injuries and the type

of force needed to cause them. Dr. Liker was asked whether there were other mechanisms that could cause similar symptoms, and she answered that there were. But Dr. Liker left no doubt that, in this case, only abusive head trauma fit.

{¶47} Reed also argues that Dr. Liker came to her conclusion without the full, correct history, which only Reed and Brian's mother knew. Reed asserts that Dr. Liker should have contacted both her and Brian's Mother to get a complete picture of what had happened. Reed says that the history given by the paramedic was incorrect and incomplete. Since Dr. Liker testified that the history was important to her opinion, Reed argues that having all the facts and the correct history might have led to a different opinion.

{¶48} Reed addressed this during her cross-examination of Dr. Liker. Dr. Liker replied that it was not for her to contact all those who may have relevant information. Moreover, we are unclear what Reed or Brian's mother could have told Dr. Liker that would have led to a different opinion. There is nothing in the record that suggests either of them had any knowledge of such critical information. Nevertheless, this was a matter for the jury to consider.

{¶49} Lastly, Reed highlights Dr. Liker's testimony that there was no way to be precise about when the injury occurred. She could not definitively say, according to Reed, that the injury occurred between 12:30 p.m. and 1 p.m. or occurred while Brian was in Reed's care or by something she did. This, in Reed's view, leaves open the possibility that Brian could have been injured before he arrived at Reed's home.

{¶50} After reviewing the trial transcripts, we think that Reed misrepresents Dr. Liker's testimony on this matter. Dr. Liker actually testified that she could not tell when an injury occurred just from looking at the injury on a CT scan or MRI. But Dr. Liker did say that "the onset of those symptoms would be expected to immediately follow whatever that event was that caused those symptoms to occur." If a child appears to be neurologically

well one minute and a half hour later the child is unconscious, said Dr. Liker, then the injury occurred during that half hour. The only reasonable conclusion that can be drawn from Dr. Liker's testimony on this matter is that Brian's injury occurred while in Reed's care.

{¶51} In sum, the evidence presented at trial simply does not support Reed's arguments. Dr. Liker, the state's expert, provided testimonial and documentary evidence to support her conclusion that Brian's injuries were the result of nonaccidental injury—that they were, in other words, the result of abuse. The nature of the injuries indicated abusive head trauma. The testimony of Brian's mother supported a finding that he was healthy and uninjured before being left in Reed's care. Furthermore, the lack of an adequate explanation for the injuries and Reed's changing account of what happened were also matters the jury could have considered in making its credibility determinations. We note too that Reed did not present her own expert to contradict Dr. Liker or to support Reed's theory that Brian's injuries were the result of a previous accident or a medical condition.

{¶52} This court has upheld convictions in other cases based on expert testimony regarding shaken-baby syndrome or abusive head trauma. *See, e.g., Evans*; *Milby*; *State v. Doss*, 12th Dist. Clermont No. CA2015-03-023, 2015-Ohio-5504; *State v. Haley*, 12th Dist. Butler No. CA2012-10-211, 2013-Ohio-4123. Thus, based on the evidence presented, we find that the jury reasonably found that Reed caused Brian's injuries. The challenges to Dr. Liker's testimony are not convincing. Given the strength of the circumstantial evidence, we conclude that the jury neither lost its way nor created a miscarriage of justice in convicting her of both of these crimes. This is not the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins*, 78 Ohio St. at 387, quoting *Martin*, 20 Ohio App.3d at 175.

{¶53} The first and second assignments of error are overruled.

### III. Conclusion

**{¶54}** We have overruled all the assignments of error presented. The trial court's judgment is affirmed.

PIPER and M. POWELL, JJ., concur.