[Cite as *State v. Evans*, 2018-Ohio-916.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.  CA2017-04-049 |
| | : | O P I N I O N |
| - vs - | | 3/12/2018 |
| | : | |
| CHRISTOPHER S. EVANS, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 15CR31438


David P. Fornshell, Warren County Prosecuting Attorney, Kirsten Brandt, 520 Justice Drive, Lebanon, Ohio 45036, for plaintiff-appellee

Timothy J. McKenna, 125 East Court Street, Suite 950, Cincinnati, Ohio 45202, for defendant-appellant


**HENDRICKSON, P.J.**

{¶ 1} Defendant-appellant, Christopher S. Evans, appeals his conviction and sentence in the Warren County Court of Common Pleas for felonious assault and endangering children.  For the reasons set forth below, we affirm appellant's conviction and sentence.

{¶ 2} On October 18, 2015, appellant cared for his three-week-old infant son while

his wife, the infant's mother (hereafter, "Mother") was running an errand. Shortly after Mother returned to the couple's home in Loveland, Warren County, Ohio, the couple noticed that the infant's lips and face had turned blue and the infant was unresponsive. Appellant and Mother sought medical attention for the infant. The infant was first treated at a local emergency room, where bruising to the infant's face, a swollen lip, and neurological injuries were discovered. Due to the neurological injuries, the infant was transferred to Cincinnati Children's Hospital for treatment. Testing revealed that the infant had subdural bleeding, a brain injury, retinal hemorrhages, and fractures in his legs. Treating physicians suspected child abuse and the local authorities were notified.

{¶ 3} Detective James Engelhardt with the Warren County Sheriff's Office spoke with appellant and Mother at the hospital and asked the couple to come to the sheriff's office the following day for an interview. On October 19, 2015, appellant and Mother drove themselves to the sheriff's office, where they were separately interviewed by Detective Engelhardt and Detective Paul Barger. During the course of appellant's interview, appellant stated he cared for his son while Mother ran to Kroger to pick up gas drops for the infant, who was having difficulties transitioning from breast milk to formula. This transition caused the infant to have stomachaches and become fussy.

{¶ 4} When questioned about the injuries the infant sustained to his legs, appellant admitted that he had been bouncing the baby too hard. Appellant told the detectives he bounced his son up and down with a force of "8 out of 10." Appellant also told the detectives that when he changed his son's diaper by himself in the child's bedroom, he became frustrated and upset. Appellant confessed to throwing his son onto the wood-framed changing table, causing the infant's head to strike the wooden portion of the table.

{¶ 5} Despite this confession, appellant was permitted to leave the sheriff's office. Days later, he was arrested and indicted on one count of felonious assault in violation of R.C.

2903.11(A)(1) and one count of endangering children in violation of R.C. 2919.22(B)(1), both felonies of the second degree. Appellant entered a not guilty plea to the charges. He then moved to suppress the statements he made to Detectives Engelhardt and Barger on the basis that his constitutional rights were violated by the detectives' failure to advise him of his *Miranda* rights prior to the interrogation being conducted.

{¶ 6} A hearing on appellant's motion to suppress was held on February 17, 2016. The state introduced, and the trial court accepted into evidence, an audio and video recording of appellant's October 19, 2015 interview, which lasted approximately an hour. The state then called Detective Engelhardt as its sole witness. Engelhardt testified that after responding to Children's Hospital on October 18, 2015, he spoke to appellant and Mother. Engelhardt explained that he did not interview Mother and appellant at this time, but asked them to come to the sheriff's office the following day so that they could discuss the infant's injuries and he could take their statements. Mother and appellant complied with his request and drove themselves to the sheriff's office on October 19, 2015.

{¶ 7} Engelhardt testified that he interviewed Mother and appellant separately inside a small interview room inside the sheriff's office. To get to the interview room, appellant and Mother had to pass through a security screening and be escorted through a secured area, which required the use of a keycard to gain entrance to or exit from the area. Appellant waited in a waiting room while Mother was interviewed.

{¶ 8} When Mother's interview was finished, appellant was escorted by Engelhardt and Barger into the interview room. The door to the interview room was closed for privacy purposes, but it was not locked. Inside the room, appellant was seated on one side of a small table with Engelhardt and Barger on the other side. The detectives had their handcuffs and sidearms on their persons at this time.

{¶ 9} Before interviewing appellant, Engelhardt advised appellant that he was not

under arrest, no charges had been filed against him, the door to the interview room was not locked, and he could terminate the interview and leave whenever he wanted. Engelhardt testified that he did not advise appellant of his *Miranda* rights before conducting the interview because appellant was not placed under arrest and Engelhardt did not view the interview as a custodial interrogation. Engelhardt explained appellant agreed to be interviewed and no threats or promises had been made to compel or encourage appellant's cooperation. At the conclusion of the interview, appellant was permitted to leave the sheriff's office without being placed under arrest, but was advised by Engelhardt to remain in contact with the detective as the investigation proceeded.

{¶ 10} On cross-examination, Engelhardt admitted he had not advised appellant at the hospital that appellant was not required to come to the sheriff's office to give a statement. Engelhardt also did not advise appellant that he might want to have an attorney present when he spoke with the detectives.

{¶ 11} Following Engelhardt's testimony, appellant took the stand and admitted he voluntarily went to the sheriff's office for an interview on October 19, 2015, and was advised by Engelhardt that the door to the interview room was unlocked and that he was free to end the interview and leave at any point in time. However, appellant testified he felt obligated to participate in the interview, and once in the secured area where the interview room was located, he did not have the ability to leave without someone swiping a keycard to authorize his exit. Appellant explained that prior to the October 19, 2015 interview, he had never been to a police station or been interviewed for any criminal charge. He testified he did not feel he could get up and end the interview or else he would be "arrested for criminal escape."

{¶ 12} After considering the foregoing testimony and evidence, the trial court denied appellant's motion to suppress. The court concluded *Miranda* warnings were not required as appellant "was free to leave the [sheriff's office] at any time and was not in custody."

{¶ 13} A jury trial commenced on January 9, 2017. At trial, the state presented testimony from Mother, the infant's maternal grandmother, Detective Barger, and three doctors who treated the infant for his injuries. Mother testified she and appellant were married in April 2015, and their son was born on September 23, 2015. Mother explained that the family's finances were strained around the time she gave birth to the baby as she was unable to work during the final weeks of her pregnancy and appellant had lost his job. Appellant collected unemployment for a short period of time and attempted to supplement his family's income by selling his plasma. He was eventually able to find a new job, but this job had lower pay and worse hours and appellant did not like it. Appellant was "stressed out daily" and his new job was making him "very angry and upset."

{¶ 14} Mother, appellant, and the infant lived on Hibiscus Drive in Loveland, Ohio, across the street from appellant's parents (hereafter, the "paternal grandparents"). Mother's parents (the infant's maternal grandparents), resided in Lebanon, Ohio. On Friday, October 16, 2015, Mother cared for the infant during the day while appellant was at work. However, the infant was left in maternal grandmother's care that evening through the morning of Saturday, October 17, 2015, while Mother and appellant had a "date night." Mother testified that while the infant was in her care on October 16, the infant was acting normally and had no physical injuries. The infant was a little fussy, as he was being transitioned from breast milk to formula and the formula upset his stomach some.

{¶ 15} After the infant was given to maternal grandmother on October 16, 2015, and Mother and appellant went out on a dinner date, Mother kept in contact with maternal grandmother. Mother had a FaceTime video call with grandmother, wherein she visually observed the infant. Mother stated she did not see any marks on the infant's face and maternal grandmother had not expressed any concerns about the baby.

{¶ 16} Mother and appellant ended their date night at paternal grandparents'

- 5 -

residence, where they used paternal grandparents' hot tub. While enjoying the hot tub, Mother and appellant got into an argument and Mother went home to the couple's house. Appellant stayed at paternal grandparents' home until after 2 a.m. A few hours after returning to his own home, appellant had to leave for work.

{¶ 17} Sometime before 10:00 a.m. on Saturday, October 17, 2015, maternal grandmother drove the infant back to Mother's house in Loveland. According to Mother, the infant had no signs of swelling or bruising to his face at this time. Mother, maternal grandmother, and the infant left Mother's house to go to a hair salon. While at the salon, the infant was alert and smiling, but spit up a few times and had to be changed after vomiting once.

{¶ 18} After the salon appointment, Mother and the infant went to maternal grandparents' home. Mother and the infant stayed the night at maternal grandparents' home after appellant decided to spend the evening with his friends after getting off work on Saturday, October 17, 2015. Sometime between 2:00 a.m. and 4:00 a.m. on Sunday, October 18, 2015, appellant showed up at maternal grandparents' residence to get some sleep. Appellant slept until about 1:00 p.m. at maternal grandparents' home. While appellant slept, Mother cared for the infant. According to Mother, the infant was "acting fine," appeared healthy, and did not have any bruising or swelling on his face. However, after being fed formula, the baby vomited and his stomach appeared bloated.

{¶ 19} Mother testified that after appellant woke up on October 17, 2015, he tried to feed the infant, but the infant was not interested in the formula. The infant started to get fussy and cry. Appellant was unable to get the baby to stop crying and handed the infant to Mother, telling her to "[g]et him to stop crying." Mother calmed the infant down and Mother, the infant, and appellant left maternal grandparents' home to return to their own residence. At the time they left maternal grandparents home at approximately 2:30 p.m., there were no

visible injuries to the infant's face.

{¶ 20} At their own home, Mother settled the infant in his baby swing. Mother decided to run to Kroger to pick up a prescription for herself and to obtain gas drops for the infant to hopefully help settle his stomach as he transitioned to the baby formula. Mother left the infant alone in appellant's care for around 40 minutes while she traveled to and from the store to pick up the medicine. According to Mother, this was the first time the baby had been left alone in appellant's care since the baby's birth.

{¶ 21} While Mother was at Kroger, she received text messages from appellant asking her, "How long you gotta wait?" and "You done and on your way back yet?" When Mother returned home, she found appellant in the living room holding the infant, with the baby's face pointing towards appellant's chest. Mother made a bottle with the gas drops and gave the bottle to appellant to feed to the infant. While appellant fed the baby in the living room, Mother went into the kitchen.

{¶ 22} Appellant told Mother that the infant had defecated and he was going to change the baby's diaper. Appellant took the infant into the infant's bedroom. About 15 minutes later, appellant approached Mother and told her that "something doesn't seem right" with the infant. Appellant asked Mother if the infant's face looked swollen or blue to her.

{¶ 23} Mother testified that while appellant was in the infant's room changing the infant's diaper, she had not heard any noises – no thumps or crying – coming from the bedroom. When appellant came back out and showed her the infant's face, she saw that the infant's upper lip was swollen and part of his face was starting to turn blue. Mother was concerned the infant was having an allergic reaction to the gas drops. The infant had gone limp and did not react when she picked him up or tried to tickle his feet. Mother called maternal grandmother for advice and, at the recommendation of maternal grandmother, Mother and appellant took the infant to the emergency room at Bethesda North Hospital.

While at the emergency room, the infant remained unresponsive and did not react to a finger prick or insertion of an I.V. The infant was stabilized and transferred to Cincinnati Children's Hospital.

{¶ 24} While at Children's Hospital, Mother learned the extent of the infant's injuries, which included fractures in his knees and ankles and several brain hemorrhages. Mother denied hurting the infant and stated she did not know how the injuries occurred. Following her and appellant's interviews with law enforcement on October 19, 2015, Mother learned that appellant admitted he caused the infant's injuries. Appellant told her "he was taking the blame so [the infant] wouldn't get taken from us" and "the only thing he could be responsible for is the leg injuries from bouncing him."

{¶ 25} Mother testified that the infant remained hospitalized for his injuries for four days. Since being released from the hospital, the infant continues to receive medical care related to the injuries. According to Mother, the infant must continue to see a neurologist every six months and, in the past year, the infant had undergone three CT scans, an MRI scan, and two full-body x-ray scans.

{¶ 26} Maternal grandmother testified that when she cared for the infant on October 16 and 17, 2015, she did not observe any swelling, discoloration, or physical marks on his face. The infant appeared to be in good health while he was at her house. According to maternal grandmother, the only people at her house while the infant was in her care were her, maternal grandfather, a three-year-old girl, and a great aunt.

{¶ 27} The doctor who treated the infant at Bethesda North testified he examined the infant and found swelling to the infant's cheek and lip. The infant also had bruising to his face, was lethargic and difficult to rouse, and was not responding to physical stimuli. The infant's parents' explanation that the infant was having an allergic reaction was not consistent with the results of the doctor's examination and the doctor believed the infant had

neurological injuries. The doctor was concerned that there was a traumatic source for the baby's injuries and asked Mother and appellant whether the baby had been in an accident or been hit, which they denied. The doctor stabilized the infant and had him transferred to Children's Hospital.

{¶ 28} At Children's Hospital, a pediatric neuroradiologist viewed the results of a CT scan, MRI scan, and two skeletal surveys completed on the infant. The neuroradiologist determined that the infant had acute subdural bleeding and brain injury. The neuroradiologist was concerned that the infant had undergone a trauma and stated that the type of brain injury the infant had sustained was similar to injuries observed in a child that had been hit by a car, involved in a car collision, or fallen out of a two-story window. A child falling off a changing table or falling a short distance would not produce the type of injuries that the infant sustained. Because the history that was reported to the hospital did not indicate that the infant had been in a serious accident, the neuroradiologist believed the injuries were not accidental, but rather were inflicted injuries.

{¶ 29} The neuroradiologist testified that the skeletal survey conducted on October 18, 2015, showed acute metaphyseal injuries, or fractures, in the infant's lower leg bones. The neuroradiologist explained that such injuries are commonly seen when a child has been forcefully shaken or yanked. The infant also had retinal hemorrhages, or bleeding behind the eye, a type of injury that is seen in children who have experienced abusive head injury. Based on the results of the infant's medical tests, the neuroradiologist testified that to a reasonable degree of medical certainty the infant had sustained his injuries as a result of physical abuse.

{¶ 30} On cross-examination, the neuroradiologist explained she did not personally examine the infant. Rather, she reviewed the results of his CT scan, MRI scan, and skeletal surveys. The neuroradiologist conceded that it was possible that if one was tossing the infant

up in the air and grabbed and yanked the infant's leg as he fell, that could explain the infant's lower extremity injuries. The neuroradiologist testified she could not pinpoint when the injuries occurred; she could only tell that the injuries were acute, meaning that they happened recently. The neuroradiologist also could not tell who caused the injuries or state whether the injuries were sustained in separate events or all at once. Nonetheless, the neuroradiologist opined that the injuries the infant suffered from were "consistent with a child that has been abused."

{¶ 31} A child abuse pediatric physician who treated the infant at Children's Hospital also testified about the type of injuries the infant sustained. The pediatrician testified he conducted a physical examination of the infant and observed bruising on the infant's face – the "kind of bruising that happens when a baby's face is held between two fingers and squeezed." The infant also had a bruise on his left shoulder and left knee, and the doctor opined that the type of bruise left on the infant's shoulder is "often caused when a part of the body comes up against something that has an edge."

{¶ 32} The pediatrician also reviewed the results of the infant's CT scan, MRI scan, and skeletal surveys. The pediatrician opined that the contusion on the infant's brain is consistent with the impact that occurs when a child is thrown down. The pediatrician also testified that, with respect to the retinal hemorrhages the infant sustained, the number and pattern of the injuries are often seen in children who have abusive head injury or shaken baby syndrome. As for the fractures discovered in the infant's legs, the pediatrician opined that the type of injuries seen on the skeletal survey are "the kind that we see in kids who are abused, not kids who have accidental injury." The pediatrician stated that the fractures were caused by "pulling or swinging of the extremities." Based on the results of the infant's medical tests and his own examination of the child, the pediatrician testified that to a reasonable degree of medical certainty, the infant was the victim of inflicted head trauma that

resulted in serious physical harm.

{¶ 33} On cross-examination, the pediatrician acknowledged that he could not identify the moment when the infant's injuries occurred and could not tell if the injuries occurred from one act or from repetitive acts. He did state, however, that due to the extensiveness of the infant's injuries and the fact that the child had no symptoms prior to the afternoon of October 18, 2015, it was a "reasonable conclusion * * * that these injuries occurred just proximate, just soon to the arrival at the hospital."

{¶ 34} Detective Barger testified at trial about his and Detective Engelhardt's October 19, 2015 interview with appellant, wherein appellant admitted he had bounced his son up and down with a force of "8 out of 10" and had thrown his son onto the wooden-framed changing table. Appellant admitted the infant's head struck the wooden portion of the changing table when he threw the infant down. Appellant told Barger his statement was true and accurate and appellant even drew Barger a diagram of the changing table that the infant was injured on.

{¶ 35} Following Detective Barger's testimony, the state rested. Defense counsel moved for acquittal pursuant to Crim.R. 29(A), arguing that the state failed to prove appellant was the individual who inflicted the injuries on the infant. The trial court denied the motion. Thereafter, paternal grandfather and one of Mother's aunts testified on behalf of appellant. Both witnesses testified appellant was a calm and patient man and a wonderful father. Paternal grandfather testified appellant used to babysit his cousins and neighborhood children and appellant never lost his temper with the children. Paternal grandfather did not believe appellant inflicted the injuries on the infant.

{¶ 36} Appellant also testified on his own behalf. Appellant acknowledged that around the time of the infant's birth, he and Mother were under a lot of financial stress. According to appellant, when Mother became stressed or upset, she would yell at him and

would become physical, often slapping him across the face or punching him in the arm.

{¶ 37} Appellant denied that he became physical with the infant or caused any harm to his son. Appellant stated his confession to Detective Barger and Detective Engelhardt was a lie and that he told the detectives what they wanted to hear because he "was afraid and * * * worried about [his] son at that time." Appellant testified he "took the blame" for the infant's injuries because he wanted to keep his family together. Appellant also admitted he sent two text messages to Mother while he cared for the infant and she shopped at Kroger. According to appellant, the reason he asked Mother "How long you gotta wait?" and "You done and on your way back yet?" was because he was eager for Mother to arrive home so that they could have "family time" together.

{¶ 38} Following appellant's testimony, the defense rested. The matter was submitted to the jury, who returned guilty verdicts on both the felonious assault charge and the endangering children charge. The jury further found that in committing these two offenses, appellant caused serious physical harm to the infant.

{¶ 39} Appellant appeared before the court for sentencing on March 16, 2017. At this time the parties agreed that the felonious assault and endangering children offenses were allied offenses, and the state elected to proceed on appellant's conviction for endangering children. The trial court indicated it had reviewed a presentence investigation report and letters submitted on appellant's behalf by various friends and family members. The court heard a statement from Mother, who indicated the infant was still working to overcome the injuries caused by appellant. Mother asked the court to impose the maximum sentence permitted by law. The state likewise requested that the court impose the maximum sentence of eight years. Appellant elected not to address the court at sentencing, but his defense counsel requested that the court impose community control sanctions rather than a prison term. Defense counsel noted that appellant had been assessed by a community corrections

center and by the Talbert House and the latter had recommended appellant undergo therapy and counseling for his mental health issues.

{¶ 40} After considering the foregoing information, the trial court determined that community control was not an appropriate sanction and that a prison term was warranted. The court sentenced appellant to three years in prison and gave him jail-time credit for 83 days.

{¶ 41} Appellant timely appealed his conviction and sentence, raising five assignments of error. For ease of discussion, we will address appellant's second and third assignments of error together.

{¶ 42} Assignment of Error No. 1:

{¶ 43} THE [TRIAL] COURT ERRED WHEN IT OVERRULED THE DEFENSE'S MOTION TO SUPPRESS.

{¶ 44} In his first assignment of error, appellant argues the trial court erred in denying his motion to suppress his October 19, 2015 statements to Detectives Engelhardt and Barger. Appellant maintains that he was in custody on October 19, 2015, and that his constitutional rights were violated by the detectives' failure to advise him of his *Miranda* rights before conducting the custodial interrogation.

{¶ 45} Our review of a trial court's denial of a motion to suppress presents a mixed question of law and fact. *State v. Cochran*, 12th Dist. Preble No. CA2006-10-023, 2007-Ohio-3353, ¶ 12. Acting as the trier of fact, the trial court is in the best position to resolve factual questions and evaluate witness credibility. *Id.* Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Oatis*, 12th Dist. Butler No. CA2005-03-074, 2005-Ohio-6038, ¶ 10. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without

deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *Cochran* at ¶ 12.

{¶ 46} The police are not required to administer the warnings set forth in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966), to every individual they question. *State v. Byrne*, 12th Dist. Butler Nos. CA2007-11-268 and CA2007-11-269, 2008-Ohio-4311, ¶ 10, citing *State v. Biros*, 78 Ohio St.3d 426, 440 (1997); *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711 (1977). Rather, the "duty to advise a suspect of constitutional rights pursuant to *Miranda* is only required when the police subject a person to a custodial interrogation." *State v. Fridley*, 12th Dist. Clermont No. CA2016-05-030, 2017-Ohio-4368, ¶ 35.

{¶ 47} "*Miranda* defines custodial interrogation as any 'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of any action in any significant way.'" *State v. Matthews*, 12th Dist. Butler No. CA2012-09-175, 2013-Ohio-3482, ¶ 10, quoting *Miranda*, 384 U.S. at 444. "In determining whether an individual was in custody during an interrogation by the police, the court must examine the totality of the circumstances surrounding the interrogation." *State v. Gomez*, 12th Dist. Butler No. CA2017-03-035, 2017-Ohio-8681, ¶ 20, citing *State v. Robinson*, 12th Dist. Butler No. CA2015-01-013, 2015-Ohio-4533, ¶ 12. "[A] person is not in custody merely because he is questioned at the police station or because he is considered a suspect" to a crime. *State v. Smith*, 12th Dist. Fayette No. CA2006-08-030, 2009-Ohio-197, ¶ 12, citing *Mathiason*, 429 U.S. at 495. Rather, a person is in custody if he is formally placed under arrest prior to a police interrogation or, if not formally arrested, when there is a significant restraint placed on his freedom of movement. *Gomez* at ¶ 20, citing *Smith* at ¶ 11. The determination of whether a custodial interrogation has occurred "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the

- 14 -

interrogating officers or the person being questioned." *State v. Coleman*, 12th Dist. Butler No. CA2001-10-241, 2002-Ohio-2068, ¶ 24, citing *Stansbury v. California*, 511 U.S. 318, 323-324, 114 S.Ct. 1526 (1994). Therefore, "[i]n judging whether an individual has been placed into custody the test is whether, under the totality of the circumstances, a 'reasonable person would have believed that he was not free to leave.'" *State v. Gumm*, 73 Ohio St.3d 413, 429 (1995), quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870 (1980).

{¶ 48} Having examined the totality of the circumstances surrounding appellant's October 19, 2015 interview, we find that appellant was not in custody at the time of the interview. Appellant agreed to an interview with law enforcement and drove himself to the sheriff's office. He was interviewed in a room where the door was closed for privacy, but was not locked. Appellant was told by the detectives that he was not under arrest, that no charges had been filed against him, that the door to the interview room was not locked, and that he could terminate the interview and leave whenever he wanted. The fact that appellant would have needed to be let out of a secured area with the use of a keycard did not place a significant restraint on his freedom of movement. Accordingly, under these circumstances, we find that appellant was not in custody at the time of October 19, 2015 interview. *See, e.g., Coleman*, 2002-Ohio-2068 at ¶ 27; *Gomez*, 2017-Ohio-8681 at ¶ 21-22; *Mathiason,* 429 U.S. at 495. As a result, *Miranda* warnings were not required. Appellant's first assignment of error is, therefore, overruled.

{¶ 49} Assignment of Error No. 2:

{¶ 50} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BY NOT GRANTING THE RULE 29 MOTION AS THERE WAS INSUFFICIENT EVIDENCE TO CONVICT.

{¶ 51} Assignment of Error No. 3:

{¶ 52} THE TRIAL COURT ERRED TO THE PREJUDICE OF THE DEFENDANT-APPELLANT BECAUSE THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 53} In his second and third assignments of error, appellant argues that the trial court erred by denying his Crim.R. 29(A) motion for acquittal based on insufficient evidence and that his convictions were against the manifest weight of the evidence.

{¶ 54} Crim.R. 29(A) provides that "[t]he court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." An appellate court reviews the denial of a Crim.R. 29(A) motion under the same standard as that used to review a sufficiency-of-the-evidence claim. *State v. Mota*, 12th Dist. Warren No. CA2007-06-082, 2008-Ohio-4163, ¶ 5; *State v. Huston*, 12th Dist. Fayette Nos. CA2006-05-021 and CA2006-06-022, 2007-Ohio-4118, ¶ 5.

{¶ 55} Whether the evidence presented at trial is legally sufficient to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997); *State v. Grinstead*, 194 Ohio App.3d 755, 2011-Ohio-3018, ¶ 10 (12th Dist.). When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. *State v. Paul*, 12th Dist. Fayette No. CA2011-10-026, 2012-Ohio-3205, ¶ 9. Therefore, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 56} On the other hand, a manifest weight of the evidence challenge examines the "inclination of the greater amount of credible evidence, offered at a trial, to support one side

of the issue rather than the other." *State v. Barnett*, 12th Dist. Butler No. CA2011-09-177, 2012-Ohio-2372, ¶ 14. To determine whether a conviction is against the manifest weight of the evidence, the reviewing court must look at the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving the conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Graham*, 12th Dist. Warren No. CA2008-07-095, 2009-Ohio-2814, ¶ 66. In reviewing the evidence, an appellate court must be mindful that the jury, as the original trier of fact, was in the best position to judge the credibility of witnesses and determine the weight to be given to the evidence. *State v. Blankenburg*, 197 Ohio App.3d 201, 2012-Ohio-1289, ¶ 114 (12th Dist.). Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997).

{¶ 57} Further, although the legal concepts of sufficiency of the evidence and weight of the evidence are quantitatively and qualitatively different, "[a] determination that a conviction is supported by the manifest weight of the evidence will also be dispositive of the issue of sufficiency." *State v. Jones*, 12th Dist. Butler No. CA2012-03-049, 2013-Ohio-150, ¶ 19.

{¶ 58} Appellant was found guilty of felonious assault in violation of R.C. 2903.11(A)(1), which provides that "[n]o person shall knowingly * * * cause serious physical harm to another or to another's unborn." "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B).

{¶ 59} Appellant was also found guilty of endangering children in violation of R.C. 2919.22(B)(1), which provides that no person shall abuse a child under 18 years of age.

Endangering children is a second-degree felony where the abuse results in serious physical harm to the child involved. R.C. 2919.22(E)(2)(d). "[T]he culpable mental state for endangering children in violation of R.C. 2919.22(B)(1) is that of recklessness." *State v. Cunningham*, 12th Dist. Butler No. CA2016-04-083, 2017-Ohio-4363, ¶ 27, citing *State v. Adams*, 62 Ohio St.2d 151 (1980), paragraph one of the syllabus. "A person acts recklessly when, with heedless indifference to the consequences, the person disregards a substantial and unjustifiable risk that the person's conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

{¶ 60} Appellant concedes that the infant suffered serious physical harm. However, he contends that the state failed to present evidence proving beyond a reasonable doubt that he was the individual who inflicted the injuries. He argues that "[a]ll of the doctors who testified admitted they could not say who inflicted the injuries, nor could they determine with certainty if the injuries were from one incident or over time."

{¶ 61} We find no merit to appellant's arguments. After reviewing the record, weighing inferences and examining the credibility of the witness, we find that appellant's convictions for felonious assault and endangering children are supported by sufficient evidence and are not against the weight of the evidence. The state presented testimony and evidence from which the jury could have found all the essential elements of the offenses proven beyond a reasonable doubt.

{¶ 62} The state presented medical testimony by three physicians involved in the care and treatment of the infant, and these physicians testified the infant suffered serious physical harm. In addition to a swollen lip and bruising on his face, left shoulder, and left knee, the infant had multiple fractures in his legs, subdural bleeding, a brain injury, and retinal hemorrhages. The injuries to the infant were not consistent with an allergic reaction but rather were consistent with shaken baby syndrome or abusive head injury. As the physicians

explained, the severity of the infant's injuries was similar to those observed when a child has been involved in a car accident, been hit by a car, or fallen out of a second-story window. The physicians agreed that there was a traumatic source for the infant's injuries. The neuroradiologist testified that to a reasonable degree of medical certainty the infant had sustained his injuries as a result of physical abuse. The child abuse pediatrician testified that to a reasonable degree of medical certainty the infant was the victim of inflicted head trauma that resulted in serious physical harm.

{¶ 63} The neuroradiologist and the child abuse pediatrician also testified that the injuries the infant presented on October 18, 2015, were the result of an acute traumatic injury. The pediatrician testified that the infant's injuries occurred "just proximate, just soon to the arrival at the hospital." While he could not pinpoint the exact moment of injury, he stated it was likely that the injury occurred "within hours" of the child's parents seeking medical care.

{¶ 64} During the weekend of the infant's injuries, the infant spent the majority of his time with either Mother or maternal grandmother. Both Mother and maternal grandmother testified that the infant was acting normally while in their care on October 16 and 17, 2015, and the infant had no physical injuries. Mother did not observe any injury to the infant on October 18, 2015, prior to running her errand at Kroger. Other than having difficulties transitioning to formula, the infant appeared healthy and happy to Mother and maternal grandmother. However, after the infant was left alone in appellant's care for approximately 40 minutes, the infant had bruising and swelling to his face and was limp, motionless, and unresponsive.

{¶ 65} The fact that the infant was healthy until being left alone in appellant's care is circumstantial evidence that appellant abused the infant and caused the infant serious physical harm while the infant was in his custody. *See State v. Milby*, 12th Dist. Warren No. CA2013-02-014, 2013-Ohio-4331; *State v. Ligon*, 12th Dist. Clermont No. CA2009-09-056,

2010-Ohio-2054; *State v. Woodson*, 8th Dist. Cuyahoga No. 85727, 2005-Ohio-5691. "Circumstantial evidence is proof of certain facts and circumstances in a given case, from which the jury may infer other, connected facts, which usually and reasonably follow according to the common experience of mankind." *State v. Young*, 12th Dist. Butler No. CA2016-10-201, 2018-Ohio-701, ¶ 61. Circumstantial evidence has the same probative value as direct evidence. *Id.*; *Jenks*, 61 Ohio St.3d at 272. "'It is not unusual that evidence of shaken baby syndrome [or abusive head injury] may be primarily circumstantial, especially where a child is in the sole custody of one adult at the time the injuries are sustained.'" *Milby* at ¶ 39, quoting *Woodson* at ¶ 53.

**{¶ 66}** In addition to the circumstantial evidence that appellant caused the infant's injuries, the jury also had before it appellant's confession to law enforcement. Appellant confessed to bouncing the infant at a force of "8 out of 10" and throwing the infant on the changing table after becoming frustrated and upset, thereby causing the infant to hit his head on the wood-framed changing table. Although appellant claimed at trial that he never hurt his son and had lied to law enforcement when giving his confession, the jury was free to discredit this testimony. "The jury, as the trier of fact, was free to believe all, part, or none of the testimony of each witness who appear[ed] before it." *State v. Woodard*, 12th Dist. Warren No. CA2016-09-084, 2017-Ohio-6941, ¶ 24. Further, "the reliability of a confession is in the province of the trier of fact." *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 37, citing *Crane v. Kentucky*, 476 U.S. 683, 688, 106 S.Ct. 2142 (1986).

**{¶ 67}** Accordingly, given the evidence presented at trial, we find that the jury did not lose its way and create such a manifest miscarriage of justice such that appellant's convictions for felonious assault and endangering children must be reversed and a new trial ordered. As appellant's convictions were not against the manifest weight of the evidence, we necessarily conclude that the state presented sufficient evidence to support the jury's finding

of guilt and to overcome appellant's Crim.R. 29 motion. *See Jones*, 2013-Ohio-150 at ¶ 19.

{¶ 68} Appellant's second and third assignment of error are, therefore, overruled.

{¶ 69} Assignment of Error No. 4:

{¶ 70} THE [APPELLANT] WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 71} In his fourth assignment of error, appellant argues he received ineffective representation by his trial counsel as counsel "did not ask for an independent evaluation of the medical records to determine if their [sic] were alternative theories as to the cause of the child's injuries."

{¶ 72} To prevail on an ineffective assistance of counsel claim, an appellant must establish that (1) his trial counsel's performance was deficient and (2) such deficiency prejudiced the defense to the point of depriving the appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984). Trial counsel's performance will not be deemed deficient unless it "fell below an objective standard of reasonableness." *Id.* at 688. To show prejudice, the appellant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. An appellant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶ 73} With respect to trial counsel's performance, we have previously recognized that "trial counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *State v. Setty*, 12th Dist. Clermont Nos. CA2013-06-049 and CA2013-06-050, 2014-Ohio-2340, ¶ 60, citing *State v. Hendrix*, 12th Dist. Butler No. CA2012-05-109, 2012-Ohio-5610, ¶ 14. It is not the role of the appellate court to second guess the strategic decisions of trial counsel. *Id.* Trial counsel's decision not to hire a separate expert and, instead, rely upon the cross-

examination of the state's experts to rebut evidence of a crime is a legitimate trial strategy. *Id.* at ¶ 62, citing *State v. Hendrix*, 12th Dist. Butler No. CA2000-03-054, 2001 Ohio App. LEXIS 4130, * 8-9 (Sept. 17, 2001). "'[S]uch a decision by trial counsel is unquestionably tactical because such an expert might uncover evidence that further inculpates the defendant" or render an opinion that substantiates and corroborates the findings of the state's expert[s]." *Id.*, quoting *Hendrix*, 2001 Ohio App. LEXIS 4130 at *9.

{¶ 74} We find that counsel was not deficient for not hiring an independent expert. Trial counsel's strategy was not to challenge the evidence demonstrating that the infant suffered serious physical harm, but rather to argue that the state failed to prove beyond a reasonable doubt that appellant was the individual who caused the infant's injuries. Additional expert testimony would not have assisted in this defense, as it is likely that such testimony would have corroborated the state's experts' findings of shaken baby syndrome or abusive head injury. Further, additional expert testimony would not have eliminated appellant as the cause of the infant's injuries, especially where appellant confessed to throwing the infant on to the changing table and bouncing the infant with a force of "8 out of 10."

{¶ 75} Trial counsel made the tactical decision to rely on the cross-examination of the state's medical witnesses in his defense of appellant. Appellant believes that trial counsel should have elicited additional testimony from the witnesses to offer other explanations for the infant's lethargy and injuries. However, "the scope of cross-examination [of a witness] falls within the ambit of trial strategy and debatable trial tactics do not establish ineffective assistance of counsel." *State v. Murphy*, 12th Dist. Butler No. CA2009-05-128, 2009-Ohio-6745, ¶ 32; *Setty* at ¶ 60. Further, the record reflects that defense counsel effectively questioned the state's medical experts about (1) the symptoms the infant presented, (2) the timing of said injuries, (3) the significance of the absence of certain injuries that are commonly seen in children suffering from shaken baby syndrome or abusive head injury,

such as the lack of ligament injuries in the infant's neck, (4) alternative methods in which the infant's injuries could have occurred (i.e., tossing the infant up in the air and grabbing the infant's leg as he fell to cause the fractures in the infant's legs), and (5) whether the experts based their opinions on a personal observation of the infant or whether their opinions were formed solely from reviewing the results of the infant's medical tests.

{¶ 76} Therefore, as all three physicians that testified at trial were effectively cross-examined by defense counsel and defense counsel was not required to hire a separate expert, we find no merit to appellant's argument that he received deficient representation by his trial counsel. Trial counsel's performance did not fall below an objective standard of reasonableness. Appellant's claim of ineffective assistance of counsel therefore fails and his fourth assignment of error is overruled.

{¶ 77} Assignment of Error No. 5:

{¶ 78} THE RECORD DOES NOT SUPPORT THE SENTENCE IMPOSED BY THE [TRIAL] COURT.

{¶ 79} In his fifth assignment of error, appellant argues the trial court erred by sentencing him to a three-year prison term for his conviction of endangering children.

{¶ 80} We review the imposed sentence under the standard of review set forth in R.C. 2953.08(G)(2), which governs all felony sentences. *State v. Marcum,* 146 Ohio St.3d 516, 2016-Ohio-1002, ¶ 1; *State v. Crawford,* 12th Dist. Clermont No. CA2012-12-088, 2013-Ohio-3315, ¶ 6. Pursuant to that statute, an appellate court does not review the sentencing court's decision for an abuse of discretion. *Marcum* at ¶ 10. Rather, R.C. 2953.08(G)(2) compels an appellate court to modify or vacate a sentence only if the appellate court finds by clear and convincing evidence that "the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *Id.* at ¶ 1. A sentence is not clearly and convincingly contrary to law where the trial court "considers the principles and

purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12, properly imposes postrelease control, and sentences the defendant within the permissible statutory range." *State v. Ahlers,* 12th Dist. Butler No. CA2015-06-100, 2016-Ohio-2890, ¶ 8; *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8. Thus, this court may "increase, reduce, or otherwise modify a sentence only when it clearly and convincingly finds that the sentence is (1) contrary to law or (2) unsupported by the record." *State v. Brandenburg,* 146 Ohio St.3d 221, 2016-Ohio-2970, ¶ 1, citing *Marcum* at ¶ 7.

**{¶ 81}** Appellant concedes that his three-year sentence falls within the permissible statutory range for a second-degree felony, as provided in R.C. 2929.14(A)(2). However, he argues that rather than a prison term, the trial court should have imposed a term of community control with mental health services as "a sentence of community control would have more properly served the principles and purposes of sentencing." We disagree.

**{¶ 82}** R.C. 2929.13(D)(1) provides that for second-degree felonies, "it is presumed that a prison term is necessary in order to comply with the purposes and principles" of felony sentencing. The purposes of felony sentencing are to protect the public from future crime by the offender and to punish the offender. R.C. 2929.11(A). A felony sentence must be reasonably calculated to achieve the purposes set forth in R.C. 2929.11(A) "commensurate with and not demeaning to the seriousness of the offender's conduct and its impact on the victim, and consistent with sentences imposed for similar crimes committed by similar offenders." R.C. 2929.11(B). In sentencing a defendant, a trial court is not required to consider each sentencing factor, but rather to exercise its discretion in determining whether the sentence satisfies the overriding purpose of Ohio's sentencing structure. *State v. Littleton*, 12th Dist. Butler No. CA2016-03-060, 2016-Ohio-7544, ¶ 12. The factors set forth in R.C. 2929.12 are nonexclusive, and R.C. 2929.12 explicitly allows a trial court to consider any relevant factors in imposing a sentence. *Id. State v. Birt,* 12th Dist. Butler No. CA2012-

02-031, 2013-Ohio-1379, ¶ 64.

{¶ 83} After a thorough review of the record, we find no error in the trial court's decision to sentence appellant to a three-year prison term. The record plainly reveals that appellant's sentence is not clearly and convincingly contrary to law and is supported by the record. In imposing appellant's three-year prison sentence, the trial court properly considered the principles and purposes of R.C. 2929.11, as well as the factors listed in R.C. 2929.12. "The fact that the trial court did not expressly cite to R.C. 2929.11 and 2929.12 during the sentencing hearing is immaterial, considering it specifically cited to both statutes within its sentencing entry." *Julious*, 2016-Ohio-4822 at ¶ 11. The court's sentencing entry provides as follows:

> The Court has considered the record, oral statements, any victim impact statement and presentence report prepared, as well as the principles and purposes of sentencing under R.C. §2929.11. The Court has balanced the seriousness and recidivism factors under R.C. §2929.12 and considered the factors under R.C. §2929.13. The Court inquired if the Defendant had anything to say in mitigation regarding the sentence.
>
> * * *
>
> The Court finds the Defendant is not amenable to an available community control sanction and that prison is consistent with the purposes and principles of R.C. §2929.11.

{¶ 84} In imposing appellant's prison sentence, the trial court stated that although appellant's actions were not the "worse * * * that [it] could envision for a case like this," appellant's actions were nonetheless "of such significance that it demand[ed] a significant punishment." Appellant abused his defenseless three-week-old son, causing the infant serious physical harm. Appellant did not accept responsibility for his actions or show remorse for his wrongdoing. Although the fact that appellant did not have a criminal record indicated that he was less likely to commit a future crime, the court found appellant's conduct serious and noted that "to put [appellant] on probation in this case, would seriously demean

what [appellant] did and is not consistent with the purposes and principles of sentencing, including punishment, deterrence and protection of the public."

{¶ 85} Appellant clearly disagrees with the trial court's analysis and balancing of the seriousness and recidivism factors in R.C. 2929.12. However, it is "[t]he trial court [that], in imposing a sentence, determines the weight afforded to any particular statutory factors, mitigating grounds, or other relevant circumstances." *State v. Steger*, 12th Dist. Butler No. CA2016-03-059, 2016-Ohio-7908, ¶ 18, citing *State v. Stubbs*, 10th Dist. Franklin No. 13AP-810, 2014-Ohio-3696, ¶ 16. The fact that the trial court chose to weigh various sentencing factors differently than how appellant would have weighed them does not mean the trial court erred in imposing appellant's sentence. *See State v. Abrams*, 12th Dist. Clermont Nos. CA2017-03-018 and CA2017-03-019, 2017-Ohio-8536, ¶ 17. The record supports the trial court's determination that the presumption of a prison term was not overcome and that a three-year prison term was an appropriate sentence. Under the circumstances presented in this case, the three-year prison sentence was commensurate with the seriousness of appellant's conduct.

{¶ 86} We therefore conclude that appellant's prison sentence was not clearly and convincingly contrary to law and that such sentence is supported by the record. Appellant's fifth assignment of error is without merit and is overruled.

{¶ 87} Judgment affirmed.


S. POWELL and RINGLAND, JJ., concur.